UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:23-CR-29-KDB |
|---|---|---|
| | ) | |
| v. | ) | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| | ) | |
| STEVEN ANDILORO | ) | |
| _____ | ) | |

COMES NOW the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and respectfully submits this sentencing memorandum. The Government recommends that the Court sentence Defendant Steven Andiloro to a sentence within the advisory Guidelines range.

## I. DEFENDANT'S CRIMES

On November 7, 2024, defendant Steven Andiloro pleaded guilty to one count of securities fraud, in violation of 15 U.S.C. §§ 78j and 78ff, and one count of wire fraud, in violation of 18 U.S.C. § 1343. The Plea Agreement, Factual Basis, and Statement of Relevant Conduct were fully incorporated into the Presentence Investigation Report and contain a recitation of the facts of the case. (PSR, Doc. 48 ¶¶ 1-58.)

Andiloro is the sole member of four LLCs. The first three—EZ Limo Car Service, Professional Security Solutions, and Flex Fitness & Health—were functional businesses in Mooresville, North Carolina. (*Id.* at ¶ 16.) EZ Limo was a transportation company that rented limos and other vehicles for airport trips, proms, and similar events. (*Id.* at ¶¶ 46, 49.) Professional Security provided security services, such as overnight monitoring of equipment at film shoot sites, although the once-large business had minimal operations by the time of the scheme. (*Id.* at ¶ 39.) Flex Fitness was an operational gym with numerous regular members in Mooresville, North

1

Carolina. Finally, Andiloro's fourth LLC, SMA Group, is Andiloro's personal LLC and was not associated with an operating business.

Andiloro's first investments in EZ Limo came in late 2017 from Steven Kranz. In each of those investment agreements, Kranz provided $50,000 to EZ Limo for the purchase of a specified limousine in exchange for periodic payments over the term of the agreement. Andiloro used the invested funds to purchase limousines and paid Kranz the returns specified in the contracts, although not from EZ Limo revenues.

By early 2018, however, Andiloro solicited investors other than Kranz and cultivated larger investments by telling grandiose stories about EZ Limo's success and the celebrity clients that purportedly used EZ Limo's services nationally. To reflect those purported clients' needs, the EZ Limo investment contracts from May 2018 until October 2020 usually listed at least four high-end limousines and were in amounts ranging from $100,000 to $382,000. Unlike the 2017 investments, Andiloro never purchased any of the limousines identified in these contracts. Instead, Andiloro nearly exclusively used the investments to make Ponzi-like payments to investors and for personal purposes, including private planes to Mexico, luxury AirBnBs, and other lavish expenditures for himself, his family, and the investors. Several investors, lulled by the timely payments and Andiloro's displays of wealth, continually invested larger sums in EZ Limo.

Over the course of the scheme, Andiloro entered into at least 23 agreements with investor-victims between January 2018 and April 2020 through which they paid a total of approximately $4.7 million to EZ Limo to fund the purchase of at least 45 vehicles. (*Id.* at ¶ 26.) He purchased no more than five of the vehicles identified in the contracts and spent the remaining funds on purposes not identified in the contracts, such as personal expenses and payments to other investors. (*Id.* at ¶ 27.)

After the onset of the COVID-19 pandemic, Andiloro obtained relief funds authorized under the Paycheck Protection Program and utilized them as another revenue source to make payments owed to investors and to support his lavish lifestyle. From April 2020 through March 2021, Andiloro obtained four PPP loans—first and second draws for both EZ Limo and Professional Security—by submitting or causing to be submitted applications containing numerous misrepresentations, including dramatic inflations of the companies' revenues, costs, and payrolls. (*Id.* at ¶ 37.)

On the first PPP application for Professional Security, Andiloro certified that the business had 460 employees and an average monthly payroll of $716,667 in 2019. (*Id.* at ¶ 38.) He submitted false tax documents listing over $23 million in revenues and $9.6 million in contract labor expenses in support of the application. (*Id.* at ¶ 39.) On the Schedule C he filed with the IRS for tax year 2019, however, Andiloro listed that Professional Security had $124,360 in revenues and $16,705 in contract labor expenses. (*Id.* at ¶ 39.)

Andiloro stated on the second Professional Security PPP application that the business had 180 employees, an average monthly payroll of $278,982, and quarterly gross receipts of between $3 million and $5 million. (*Id.* at ¶ 52.) Andiloro also submitted false supporting documents, including tax returns stating that Professional Security had $14,976,000 in gross receipts, $1,993,811 million in contract labor expenses, and $3,247,789.36 in gross wages in 2020. (*Id.* at ¶ 53.) However, the 2020 Schedule C filed with the IRS for Professional Security listed $91,920 in gross revenues, $36,800 in contract labor expenses, and $14,542 in net losses. (*Id.*) For both Professional Security PPP applications, Andiloro submitted invoices for movie shoot security services that the company had actually provided in previous years, but with the date of the invoices digitally edited to be within the PPP's one-year window to show business operations (and therefore

eligibility for the PPP loans). (*Id.* at ¶¶ 40, 54.)

On the first PPP application for EZ Limo, Andiloro certified that the business had 1 employee and an average monthly payroll of $459,318 in 2019. (*Id.* at ¶ 45.) He submitted false tax documents listing over $10 million in revenues and $3.25 million in contract labor expenses. (*Id.* at ¶ 46.) Contrarily, EZ Limo's Schedule C for 2019 stated that EZ Limo had around $56,436 in revenues and $14,486 in contract labor expenses. (*Id.* at ¶ 46.)

On the second PPP application for EZ Limo, Andiloro listed that the business had an average monthly payroll of $67,630.67 and gross receipts of $2,585,000 in the third quarter of 2019. (*Id.* at ¶ 49.) The 2020 EZ Limo Schedule C filed with the IRS listed $27,000 on gross revenues and $3,600 in contract labor expenses. (*Id.*)

Andiloro received a total of $2,614,529 in PPP funds. (*Id.* at ¶¶ 42, 48, 51, 56.) He used a significant amount of the funds to make the periodic payments owed to EZ Limo investors. (*Id.* at ¶ 57.) Andiloro also used about $258,000 of the Professional Security PPP funds to purchase a vacation home in Boynton Beach, Florida, among other personal expenses. (*Id.* at ¶ 44.)

Andiloro's victims had stopped making new investments in EZ Limo by approximately October 2020 and Andiloro remained current on the periodic payments he owed to EZ Limo investors until approximately December 2020. In order to prolong the securities fraud scheme, Andiloro entered into agreements with three victims through which they purportedly obtained partial ownership interests in ANDLORO's marijuana dispensary business in Michigan. (*Id.* at ¶ 28.) In truth and in fact, however, Andiloro did not own a marijuana dispensary business, and Andiloro quickly spent the money on personal expenses and obligations to the EZ Limo investors. (*Id.*) For example, victim Larry Graham wired $1,000,000 to Andiloro on September 23, 2021, and one day later, Andiloro wired $500,000 to Kranz to satisfy Kranz's buyout of his EZ Limo

investments. (*Id.* at ¶ 33.) At the time of the plea agreement, the Government could prove that Andiloro received a total of $1,580,000 in fraudulent dispensary investments. (*Id.* at ¶ 36.)

Andiloro received $6,172,626 in investments in the course of the securities fraud scheme, spent no more than $173,000 on limousines, and paid approximately $3,496,000 to investors prior to the scheme being discovered by law enforcement, resulting in a net loss on Count One of $2,503,626. (*Id.* at ¶ 36.) Accordingly, the aggregate actual loss in the case is $5,118,155. (*Id.* at ¶¶ 58.)

## II. ADVISORY GUIDELINES

In determining the appropriate sentence, "a district court must begin by correctly calculating the applicable Guidelines range." *United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The advisory Guidelines are "the starting point and the initial benchmark." *Gall* at 49. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice. . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). "[A] Guidelines sentence will usually be reasonable, because it reflects both the Commission's and the sentencing court's judgment as to what is an appropriate sentence for a given offender." *Id.* at 351. Ultimately, however, the appropriate sentence is for the District Court to determine based on the factors enumerated in 18 U.S.C. § 3553(a), and "any sentence, within or outside of the Guidelines range, as a result of a departure or of a variance, must be reviewed by appellate courts for reasonableness pursuant to an abuse of discretion standard." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011).

The PSR determined the Total Offense Level to be 24 with a criminal history category of II, resulting in an advisory Guidelines range of 57 to 71 months. Andiloro objected to the criminal

history calculation in the PSR. For the reasons set forth below, the probation officer correctly calculated Andiloro's criminal history score, which the Court should adopt.

The PSR identifies two convictions for which Andiloro scored criminal history points. The first is a conviction in Gaston County District Court for operating an unlicensed security firm. Andiloro was arrested on May 5, 2014, and sentenced to a 30-day suspended sentence on September 29, 2014. (Doc. 48 ¶ 82.) The second is a prayer for judgment in Mecklenburg County for a violation of the private protective services statutes. Andiloro was also arrested on this charge on May 5, 2014, and sentenced on May 29, 2014. (*Id.* at ¶ 83.) Andiloro lodged two objections to the criminal history category calculation: first, that there is no evidence in the PSR that the prayer for judgment involved an admission of guilt, and second, that the two criminal history points double-count the same conduct. (Def. Obj. PSR, Doc. 47.)

As an initial matter, "defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *United States v. Fowler*, 58 F.4th 142, 151 (4th Cir. 2023) (quoting *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990)). "Without such a showing, 'the government meets its burden of proving those facts by a preponderance of the evidence, and the district court is free to adopt the findings of the presentence report without more specific inquiry or explanation.'" *Id.* (quoting *United States v. Revels*, 455 F.3d 448, 451 n.2 (4th Cir. 2006)).

Section 4A1.1(c) directs that one additional point be added to a defendant's criminal history score for any "prior sentence" of less than 60 days. U.S.S.G. § 4A1.1(c). The definition of "prior sentence" for application in Section 4A1.1(c) includes "[a] conviction for which the imposition or execution of sentence was totally suspended or stayed[.]" U.S.S.G. § 4A1.2(a)(3). A

6

diversionary disposition made "without a finding of guilt" does not count as a prior sentence. U.S.S.G. § 4A1.2(f). However, "[a] diversionary disposition resulting from a finding or admission of guilt, or a plea of *nolo contendere*," is counted "even if a conviction is not formally entered[.]" *Id*. The commentary to § 4A1.2 states that a diversionary disposition qualifies as a prior sentence only if it results from "a judicial determination of guilt or an admission of guilt in open court." U.S.S.G. § 4A1.2 at cmt. 9.

Under North Carolina law, a prayer for judgment continued is a possible disposition for certain offenses after a defendant has entered a guilty plea or been found guilty of the qualifying offense. *United States v. Miller*, 992 F.3d 322, 325 (4th Cir. 2021). Accordingly, under the Guidelines, that adjudication of guilt preceding the entry of the PJC necessitates the assignment of one criminal history point under Section 4A1.1(c). *Id*.

Here, Andiloro received a PJC to dispose of the Mecklenburg County charge and received one criminal history point. (Doc. 48 ¶ 83.) The PSR does not, and need not, affirmatively state that Andiloro was adjudicated guilty; it is axiomatic that dispositions of criminal cases are only imposed after a finding of guilt. Thus, under North Carolina and federal law, the PJC counts a prior sentence and the PSR correctly attributes it one criminal history point.

Andiloro's two criminal history points were not double-counted under the Guidelines. Prior sentences for which the defendant was arrested on the same day are counted separately "unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day." U.S.S.G. § 4A1.2(a)(2).

Here, Andiloro's criminal history points arise from sentences imposed by different district courts with different charging instruments and that were sentenced on different dates. (Doc. 48 ¶¶ 82-83.) Whether the underlying conduct is related is not a relevant consideration under the

7

Guidelines. Accordingly, the convictions count separately as prior sentences and the PSR correctly calculated Andiloro's criminal history score.

The Government acknowledges, however, that the Guidelines lend support to the argument that Andiloro's classification as criminal history category II overstates his criminal history. Indeed, a Guidelines policy statement expressly recognizes that a downward departure from the defendant's criminal history category may be warranted where the defendant's heightened criminal history category is derived from two minor misdemeanor convictions close to ten years prior to the instant offense with no evidence of criminal behavior in the intervening time. U.S.S.G. § 4A1.1 at cmt. 3(A)(i). Although Andiloro's misdemeanor convictions occurred four years before the current scheme began (rather than ten), the principle underlying the Guidelines policy statement remains persuasive. Andiloro's misdemeanors were minor, regulatory misdemeanors that are significantly less serious than almost any other crime that would cause a defendant to receive an elevated criminal history category. While licensing misdemeanors are not included in the list of crimes that never count as prior sentences under Section 4A1.2(c), they are not significantly more serious than those crimes—particularly in the context of Andiloro's proffered explanation. (Doc. 47 at p.2.)

The PSR correctly determined the Total Offense Level to be 24 with Criminal History Category II, resulting in an advisory Guidelines range of 57 to 71 months. The Government acknowledges that the Guidelines support the Court evaluating the seriousness of Andiloro's criminal history on both departure and variance grounds.

**III.  THE § 3553(a) FACTORS CALL FOR A GUIDELINES SENTENCE**

The 18 U.S.C. § 3553(a) factors dictate a sentence within the advisory Guidelines range.

### A. Nature and Circumstances of the Offense and Seriousness of the Offense.

The nature and circumstances of Andiloro's crimes warrant a guideline sentence. Andiloro's crimes were not an aberration, nor a one-time lapse in judgment; rather, they constituted a pervasive, systematic, and well-thought-out course of conduct over a span of years. Andiloro's schemes required sophistication, preparation, deceit, and persistence. And his exploitation of limited COVID-19 relief funds showed disregard for the recovery of vulnerable Americans who were attempting to recover from the devastating economic impacts of the COVID-19 pandemic.

### B. History and Characteristics of the Defendant.

Like many white collar defendants, Andiloro is intelligent and charismatic; the very same traits that allowed Andiloro to garner the trust and respect of his victims are the traits he used to defraud them. He had no problem deceiving those who respected and admired him to line his pockets with their money. Andiloro's criminal conduct in this case was not a spontaneous one-time bad choice. Rather, it was a constant choice he made and continued to make over and over again.

As set forth above, Andiloro is a Criminal History Category II with no meaningful criminal history. Prior to the instant offenses, Andiloro lived a law-abiding and productive life, employing dozens to hundreds of individuals. Andiloro also admitted responsibility for this offense. Andiloro's history and characteristics weigh in his favor and demonstrate a lower risk of recidivism than the typical Criminal History Category II defendant.

### C. The Need to Promote Respect for the Law, Provide Adequate Deterrence, Protect the Public, and Provide Just Punishment.

A Guidelines sentence is sufficient in this case to adequately promote respect for the law, afford adequate deterrence, protect the public from further crimes of the defendant, and provide

just punishment for the offense. Fraud schemes such as this require specific and general deterrence that only can be accomplished through lengthy periods of incarceration.

As to general deterrence, soliciting and defrauding investor victims is "the type of rational and calculated crime that is most susceptible to general deterrence." *United States v. Thorpe*, No. 17-CR-40062, 2018 WL 5322352, at *4 (S.D. Ill. Oct. 29, 2018). "As a counterbalance for those without adequate conscience, the resulting punishment must send a message" that a lengthy prison sentence will result. *Id*. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id*. at 1227.

Moreover, as evidenced by the length and scope of Andiloro's fraudulent scheme, investment fraud schemes such as this can be very difficult to detect and stop early. Where offenses are lucrative and difficult to detect and punish, general deterrence is key. *See United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("In a number of opinions … we have explained that general deterrence is an important factor in white-collar cases, where the motivation is greed."). The Fourth Circuit has explicitly recognized the importance of incarceration for defendants convicted of white collar crimes such as tax evasion, theft, fraud and embezzlement. *See United States v. Engle*, 592 F3.d 495, 501 (4th Cir. 2010).

Furthermore, the PPP fraud scheme was motivated by self-interest and greed at a time when millions of Americans were suffering from the economic impact of a global pandemic. As the pandemic spread, so too did fraud related to the PPP program and other programs designed to

10

provide critical economic assistance. A significant sentence is necessary to provide just punishment for obtaining disaster relief funds via fraud.

Thus, a Guidelines sentence is necessary to protect the public from Andiloro and to deter others from using their reputation and community connections to betray the trust of friends and neighbors and prey on vulnerable investors.

## IV. RESTITUTION

The PSR correctly sets forth Andiloro's restitution obligation and correctly credits Andiloro for amounts repaid to investors, except that one additional victim, Edward Morris, was identified as a victim of the dispensary scheme after the finalization of Andiloro's PSR. Accordingly, the Court should impose restitution in the amount of $5,341,155 to the parties identified below:

| | |
|---|---|
| Steven Kranz | $399,626 |
| Larry Graham | $1,412,000 |
| Paul Bellissimo | $450,000 |
| Jim Allen[1] | $165,000 |
| Wayne Seay | $150,000 |
| Sean Connolly[2] | $100,000 |
| United States Small Business Administration | $2,614,529 |
| Edward Morris | $50,000 |

## V. CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the advisory Guidelines range.

---

[1] Dr. Allen invested $165,000 in EZ Limo and $50,000 in Flex Fitness, and Andiloro repaid him an estimated return of $35,000. Accordingly, Dr. Allen's victim impact statement states that Andiloro's outstanding obligation is $180,000. However, the investments in Flex Fitness were not fraudulent, paid real returns, and are not part of the scheme to which Andiloro pleaded guilty. Accordingly, only the losses related to EZ Limo are properly includable as restitution.

[2] Connolly also invested $50,000 in Flex Fitness that was not included for the same reason as Dr. Allen's investment.

11

Respectfully submitted on May 14, 2025.

>RUSS FERGUSON
>UNITED STATES ATTORNEY
>
>/s/ **Graham Billings**
>NC Bar Number: 55972
>
>/s/ **Katherine Armstrong**
>NC Bar Number: 36305
>
>Assistant United States Attorneys
>United States Attorney's Office
>227 West Trade Street, Suite 1650
>Charlotte, North Carolina 28202
>Telephone: 704.344.6222

## CERTFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted on May 14, 2025.

RUSS FERGUSON
UNITED STATES ATTORNEY

/s/ **Graham Billings**
NC Bar Number: 55972

/s/ **Katherine Armstrong**
NC Bar Number: 36305

Assistant United States Attorneys
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: 704.344.6222